AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

**9/5/2021**

CENTRAL DISTRICT OF CALIFORNIA
BY: ___jb___ DEPUTY

United States of America,

　　　　Plaintiff,

　　v.

SHAIBRANA SHANTEL RHONE,

　　　　Defendant.

Case No.　2:21-mj-04132-Duty

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

　　I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of September 4, 2021, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §  841(a)(1), (b)(1)(A) | Possession with intent to distribute a controlled substance |

This criminal complaint is based on these facts:

**Please see attached affidavit.**

☒ Continued on the attached sheet.

_____
*/S/ Ashish Pandya*
*Complainant's signature*

_____
Ashish Pandya, DEA Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:　___September 5, 2021___

City and state:　_Los Angeles, California_

_____
*Judge's signature*

_____
Honorable Jean Rosenbluth
*Printed name and title*

**AFFIDAVIT**

I, Ashish Pandya, being duly sworn, declare and state as follows:

**I.     PURPOSE OF AFFIDAVIT**

1.     This affidavit is made in support of a criminal complaint against **SHAIBRANA SHANTEL RHONE** ("**RHONE**") for a violation 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances).

2.     This affidavit is also made in support of an application for a warrant to search one digital device, specifically an iPhone Pro Max 11 with serial number F2LD64NEN70L seized from **RHONE'**s person on September 4, 2021, which is currently in the custody of the Drug Enforcement Administration ("DEA") in Los Angeles, California, as described below and in Attachment A (the "**TARGET DEVICE**").

3.     The requested search warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances)(the "Subject Offenses"), as described in Attachment B.

4.     Attachments A and B are incorporated into this affidavit by reference.

5.     The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.

6.    This affidavit is intended to show only that there is probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.

7.    Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, unless stated otherwise, all dates and amounts in this affidavit are approximations, and the words "on or about" and "approximately" are omitted for clarity.

## II.  **BACKGROUND OF AFFIANT**

8.    I am a special agent with the DEA and have been so employed since 1998. I am currently assigned to the Los Angeles International Airport Narcotics Task Force, which is tasked with, among other things, investigating narcotics trafficking and money laundering violations under the United States Code.

9.    I have received approximately 16 weeks of specialized training in Quantico, Virginia pertaining to narcotics trafficking, money laundering, undercover operations, confidential source management, and electronic and physical surveillance. I have been involved in several hundred investigations dealing with the possession, manufacturing, distribution, and importation of controlled substances, money laundering, and drug and money laundering conspiracies.

10.  As a DEA special agent, I have participated in the execution of search warrants, conducted physical and electronic surveillance, reviewed audio and video surveillance, spoken to confidential sources, operated in an undercover capacity, interviewed witnesses, suspects, and defendants, and discussed drug investigations with other experienced agents. Based on my training and experience, I have knowledge of the ways in which drug traffickers use digital devices, including cell phones, to further their drug trafficking activities.

### III.  SUMMARY OF PROBABLE CAUSE

11.  On September 4, 2021, at approximately 5:30 a.m., **RHONE** entered Los Angeles International Airport and checked in for Delta Airlines flight 703, which was scheduled to depart for Orlando, Florida at approximately 6:30 a.m. When **RHONE** checked in, **RHONE** checked a single suitcase.

12.  Thereafter, during a routine airport screening for explosives, two bricks of an unknown substance wrapped in plastic and five clear plastic bags containing a crystallized substance were discovered in **RHONE**'s suitcase. The substance contained in the two bricks tested presumptively positive for fentanyl with a gross weight of 2.2 kilograms. The substance in the five plastic bags tested presumptively positive for methamphetamine with a gross weight of 10.31 kilograms.

13.  At the time of arrest, **RHONE** possessed the **TARGET DEVICE** on her person.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

14.   Based on my review of law enforcement reports, airport surveillance footage, and my own observations and knowledge of the investigation, I am aware of the following:

**A.    TSA Agents Discover Controlled Substances in RHONE's Checked Suitcase**

15.   September 4, 2021, at approximately 5:30 a.m., **RHONE** entered Los Angeles International Airport ("LAX") and checked in for Delta Airlines flight 703 ("flight 703"), which was scheduled to depart for Orlando, Florida at approximately 6:30 a.m.

16.   When **RHONE** checked in, **RHONE** checked a single suitcase that Delta assigned baggage number 6006292193 ("**RHONE**'s suitcase").

17.   According to the LAX Police Department ("LAXPD") incident report, at approximately 5:45 a.m., TSA Transportation Security Officer ("TSO") Pinson was assigned to conduct routine security screenings of checked luggage in the LAX Terminal 2 baggage screening room.

18.   While on that assignment, TSO Pinson observed an anomaly on the x-ray screen which, at that moment, was scanning **RHONE**'s suitcase.

19.   TSO Pinson then conducted a secondary screening of **RHONE**'s suitcase to determine whether the anomaly was an explosive, and upon opening the suitcase, observed two bricks of an unknown substance wrapped in plastic and five clear plastic

bags containing a crystallized substance. TSO Pinson immediately contacted his supervisor, who then notified LAXPD.

20.  At approximately 6:10 a.m., LAXPD Officer Sermeno responded to the baggage screening room where she observed **RHONE**'s suitcase, an open blue roller bag, on the TSA inspection table. **RHONE**'s suitcase was equipped with a Delta baggage tag associated with flight 703 bearing **RHONE**'s name and baggage number 6006292193.

21.  On the TSA inspection table, in plain view, Officer Sermeno observed that **RHONE**'s suitcase contained two rectangular bricks containing suspected controlled substances wrapped in plastic, five large vacuum-sealed bags containing a crystalized substance resembling crystal methamphetamine, and men's clothing.

22.  Airline records showed that flight 703, the flight **RHONE** booked, was scheduled to depart to Orlando from Gate 28. Officers Sermeno, Tang, and Franco then went to Gate 28 in an attempt to locate **RHONE**, while another officer, Officer Cisneros, confirmed that **RHONE** had already boarded flight 703 (which was pending takeoff). Officer Sermeno then entered the aircraft and escorted **RHONE** off of the plane.

23.  At approximately 6:45 a.m., Officer Sermeno read **RHONE** Miranda warnings verbatim from her Form 15.03.00. **RHONE** stated that she understood her rights and agreed to speak with law enforcement. Thereafter, **RHONE** advised Officer Sermeno that **RHONE** had not packed **RHONE**'s suitcase and was unaware of its contents. Instead, **RHONE** stated that her best friend,

Coconspirator 1, packed and told **RHONE** to check **RHONE's** suitcase, and that **RHONE** never looked inside the suitcase.

24.  Officer Sermeno then asked if **RHONE** knew Coconspirator 1's phone number. In response, **RHONE** stated that the number was on **RHONE's** cell telephone, the **TARGET DEVICE**.

25.  **RHONE** then gave Officer Sermeno consent to search for Coconspirator 1's number on **RHONE's** cell phone. While Officer Sermeno was retrieving **RHONE's** cell phone, Officer Sermeno observed from a particular number a missed call and a text message reading "what are they asking you," visible on the main screen of the **TARGET DEVICE**. Officer Sermeno asked **RHONE** if that number belonged to Coconspirator 1, and **RHONE** responded affirmatively.

26.  At approximately 7:20 a.m., officers transported **RHONE** and **RHONE's** suitcase to a law enforcement office at LAX. At the office, a DEA special agent, utilizing the Thermo Scientific TruNarc Raman spectrometer, field-tested the substances found in **RHONE's** suitcase.

27.  The substance contained in the two bricks wrapped in plastic tested presumptively positive for fentanyl with a gross weight of 2.2 kilograms. The substance in the five plastic bags tested presumptively positive for methamphetamine with a gross weight of 10.31 kilograms.[1]

28.  The suitcase used to transported fentanyl and methamphetamine was the only bag **RHONE** checked for flight 703 from Los Angeles to Orlando.

---

[1] The foregoing weights include packaging.

29.  At the time of arrest, **RHONE** was in possession of the **TARGET DEVICE**.

## V.   TRAINING AND EXPERIENCE ON DRUG TRAFFICKING

30.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Los Angeles is a major hub for drug distribution. Partly because of the close proximity of Los Angeles to the Mexican border, prices of drugs are generally lower here than prices on the east coast. Drugs enter Los Angeles from across the Mexican border or overseas from Asia and are then distributed across the country. LAX is commonly used to facilitate drug transportation for Drug Trafficking Organizations, who send their couriers through LAX with drugs in their luggage. Numerous drug arrests are made at LAX every ear, with couriers transporting drugs in checked bags.

b.  Drug trafficking is a business that involves numerous coconspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with coconspirators, conduct drug transactions, and transport drugs or drug proceeds.

c.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of

illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

     d.    Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various coconspirators tend to be ongoing until their arrest. Communications between people buying and selling drugs take place by telephone calls and messages, such as email, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales. It is also common for drug traffickers to carry cell phones in order to remain in contact with drug suppliers or customers, to communicate with coconspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various coconspirators, and to coordinate the amount of drugs trafficked, as well as payment amounts and methods. Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

e.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and coconspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and coconspirators involved in narcotics trafficking.

f.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers. These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

g.    In the case of drug couriers, cell phones or digital devices are also commonly used to communicate itineraries to couriers and provide directions to couriers along their route and once they arrive at their destination.

h.    To that end, I know that drug traffickers and drug couriers use cell phones to further various aspects of the drug trade. Drug traffickers and drug couriers use cell phones to contact (by way of both voice call and electronic message)

drug suppliers, customers, and coconspirators, all for the purpose of acquiring, storing, transporting, and distributing drugs. Drug traffickers also maintain, on their cell phones, records related to drug distribution (e.g., ledgers and notes pertaining to drug sales), and photographs of drugs, drug paraphernalia, and the instruments of the drug trade (including firearms). Further, the location data associated with a drug trafficker's cell phones (which is often stored locally on cell phones) assists investigators in identifying the drug trafficker's residence, stash house, coconspirators, the residences of the trafficker's coconspirators, and meeting locations.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

31.   As used herein, the term "digital devices" includes the **TARGET DEVICE.**

32.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device. That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them. For example, recoverable
data can include evidence of deleted or edited files, recently
used tasks and processes, online nicknames and passwords in the
form of configuration data stored by browser, email, and chat
programs, attachment of other devices, times the device was in
use, and file creation dates and sequence.

c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it. For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions. Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed. Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

34.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **RHONE**'s' thumb and/or fingers on the **TARGET DEVICE** and (2) hold the **TARGET DEVICE** in front of **RHONE**, with the party's eyes open to activate the facial, iris, and/or retina-recognition feature.

35.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

36. Based on the foregoing, there is probable cause to believe that **SHAIBRANA SHANTEL RHONE** ("**RHONE**") violated 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances). Further, there is probable cause to believe that the items to be seized described in Attachment B will be found in the **TARGET DEVICE**, described in Attachment A.

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>5th</u> day of <u>September</u> , 2021.

THE HONORABLE JEAN ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

<u>PROPERTY TO BE SEARCHED</u>

An iPhone Pro Max 11 with serial number F2LD64NEN70L seized from **SHAIBRANA SHANTEL RHONE'**s person on September 4, 2021, which is currently in the custody of the Drug Enforcement Administration in Los Angeles, California (the **"TARGET DEVICE"**).

i

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy to distribute and possess with intent to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers,

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls,

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from the **TARGET DEVICE** and which relate to the Subject Offenses,

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

ii

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from the **TARGET DEVICE** and which relate to the Subject Offenses,

     e.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, along with travel records,

     f.   Audio recordings, pictures, video recordings, or still captured images relating to the possession or distribution drugs and the collection or transfer of the proceeds of the Subject Offenses,

     g.   Contents of any calendar or date book,

     h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations, and

     i.   Any device used to facilitate the Subject Offenses (and forensic copies thereof).

     j.   Any **TARGET DEVICE** which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

k.   With respect to any **TARGET DEVICE** containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat and instant messaging logs, photographs, and correspondence,

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

iii. evidence of the attachment of other devices,

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

v.   evidence of the times the device was used,

vi.   passwords, encryption keys, and other access devices that may be necessary to access the device,

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it,

    viii.  records of or information about
Internet Protocol addresses used by the device,

    ix. records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

  2. As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

**II.  SEARCH PROCEDURE FOR THE TARGET DEVICE**

  3. In searching a **TARGET DEVICE** (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

    a. Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") may
search any **TARGET DEVICE** capable of being used to facilitate the
above-listed violations or containing data falling within the
scope of the items to be seized.

    b. The search team will, in its discretion, either
search each **TARGET DEVICE** where it is currently located or
transport it to an appropriate law enforcement laboratory or
similar facility to be searched at that location.

c.    The search team shall complete the search of the **TARGET DEVICE** as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device beyond this 120-day period without obtaining an extension of time order from the Court.

d.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each **TARGET DEVICE** capable of containing any of the items to be seized to the search protocols to determine whether the **TARGET DEVICE** and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.    The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items

to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      f.   If the search determines that a **TARGET DEVICE** does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the **TARGET DEVICE** and delete or destroy all forensic copies thereof.

      g.   If the search determines that a **TARGET DEVICE** does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      h.   If the search determines that the **TARGET DEVICE** is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      i.   The government may also retain a **TARGET DEVICE** if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the **TARGET DEVICE**, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.   During the execution of this search warrant, law enforcement is permitted to (1) depress **SHAIBRANA SHANTEL RHONE**'s thumb and/or fingers on the **TARGET DEVICE** and (2) hold the **TARGET DEVICE** in front of **SHAIBRANA SHANTEL RHONE** with the party's eyes open to activate the facial, iris, and/or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989), specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.